IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA KARNOK, | ) | |
| | ) | Case No. 1:18-cv-2901 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **MEMORANDUM ORDER** |
| Defendant. | ) | **AND OPINION** |

## I.      Introduction

Plaintiff, Patricia Karnok, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 8; ECF Doc. 11. Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Karnok's application for SSI must be AFFIRMED.

## II.      Procedural History

On August 18, 2014, Karnok protectively applied for SSI.  (Tr. 184, 199, 237, 297-302).[1] Karnok alleged that she became disabled on October 1, 2010, due to "constant pain;

---
[1] The administrative transcript is in ECF Doc. 10.

fibromyalgia." (Tr. 184, 199, 297). The Social Security Administration denied Karnok's applications initially and upon reconsideration. (Tr. 184-214, 237-38). Karnok requested an administrative hearing. (Tr. 257-60). ALJ Scott Canfield heard Karnok's case on February 7, 2017, and denied the claim in a May 2, 2018, decision. (Tr. 42-59, 90-136). On October 29, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-7). On December 18, 2018, Karnok filed a complaint to seek judicial review of the Commissioner's decision. ECF Doc. 1.

### III. Evidence

#### A. Personal, Educational and Vocational Evidence

Karnok was born on November 23, 1968, and she was 45 years old when she filed her application. (Tr. 53). Karnok had an 8th grade education, but she was able to communicate in English. (Tr. 53, 99). She did not have any past relevant work experience. (Tr. 53).

#### B. Relevant Medical Evidence

On March 28, 2011, Karnok told Jessica Gallagher, MSIV, and Muhammad Khan, MD, that she had progressively worse pain in her back, arms, and legs. (Tr. 495). She rated her pain as a 7/10, and she said that lifting, standing, and sitting made it worse. (Tr. 494). Cortisone injections and Pelevil did not give her relief, and she took naproxen and ibuprofen. (Tr. 495). Karnok also said that she did Zumba for exercise and had lost 15 pounds. (Tr. 494). On examination, Karnok had a full range of motion, full strength, a nontender shoulder, mild crepitus, negative straight leg raise, and 2/18 fibromyalgia tender points. (Tr. 496).

On April 12, 2011, Karnok told Pavani Adusumilli, MD, that she quit working due to her pain and that she was stressed about her back problems. (Tr. 491). Karnok said that she used ibuprofen, Naprosyn, Tylenol, and Mobic, which were not helpful. (Tr. 491). She also noted that her rheumatologist had recommended antidepressants. (Tr. 491). On examination,

Dr. Adusumilli noted that Karnok had limited range of motion and tenderness in her back, but there were no noted issues in her extremities. (Tr. 492). Karnok was alert and oriented to time, place, and person. (Tr. 492).

On June 7, 2011, Karnok told Brendan Astley, MD, that she had "constant, sharp, [and] burning" pain in her lower back. (Tr. 487). Karnok said that her pain was gradually worse, and heat and nerve blocks did not help. (Tr. 487). On examination, Karnok had tenderness in her cervical spine, moderate pain in her lumbar spine, normal extremities, normal range of motion, and normal strength. (Tr. 489). Dr. Astley prescribed pool therapy, weight control, tramadol, Lyrica, and physical therapy. (Tr. 489). On August 3, 2019, Dr. Astley gave Karnok a nerve block at the bilateral C4 and C5 levels. (Tr. 461-62). At a follow-up on March 7, 2013, Karnok told Dr. Astley that her pain was gradually worse, that she had stopped taking one of her prescribed medications (Elavil), and that she was "doing okay" with Neurontin and tramadol. (Tr. 862). Dr. Astley recommended that Karnok use back protection, use a program to increase strength and flexibility, exercise to relieve her fibromyalgia, continue to use tramadol and Neurontin, and receive a lidocaine infusion. (Tr. 865). On June 3, 2013, Karnok told Dr. Astley that her pain continued to get worse, especially with bending, rotating, standing, and hot weather. (Tr. 411, 716, 956). She said that she had not taken her tramadol and Neurontin because they were too expensive, and Neurontin made her panic. (Tr. 411, 716, 956). Dr. Astley did not note any significant changes on examination, adjusted Karnok's medications, referred her to an arthritis clinic, and directed her to continue fibromyalgia exercises. (Tr. 413, 718, 959).

On December 18, 2012, Thomas Ginley, DO, determined that Karnok's condition suggested lupus and mixed connective tissue disease, and he referred her to a rheumatologist. (Tr. 445-46). On March 20, 2015, Karnok told Dr. Ginley that she was still in pain due to fibromyalgia and did "no/little regular activity." (Tr. 1231-32). On examination, Dr. Ginley

noted no distress, normal range of motion in the back, normal extremities, intact strength, normal gait, normal reflexes, intact sensation, and generalized tenderness. (Tr. 1235). Dr. Ginley told Karnok to watch her diet and try to be more active. (Tr. 1237).

On January 22, 2013, Karnok told Dr. Zohair Abbas, MD, that she had pain all over her body, swelling in her hands, morning stiffness, poor sleep, and a prior fibromyalgia diagnosis. (Tr. 439). On examination, Karnok had full range of motion in her shoulders and extremities, no swelling, full grip strength, and no tenderness other than some in her sacroiliac joint. (Tr. 440-41).

On April 1, 2013, Karnok saw Mary Ellen Lieder, CNP, for mental health medication management. (Tr. 746). Karnok told Lieder that she was in pain management for her fibromyalgia, and that she had intentionally lost 40 pounds in the previous 2 years. (Tr. 746). Karnok said that she was stressed all the time, Neurontin did not help her pain, and she was frustrated that treatment providers treated her pain as a mental condition. (Tr. 746). On examination, Lieder noted that Karnok had a logical and organized thought process, sustained attention/concentration, normal memory, and fair judgment/insight. (Tr. 746-47). Karnok reported that she had 7/10 pain all over her neck, lower back, thighs, and arms. (Tr. 747). At a follow-up on May 6, 2013, Lieder did not note any significant changes in Karnok's physical or mental condition, except that she had 10/10 pain in her pelvic region after being diagnosed with herpes. (Tr. 726-27).

On April 10, 2013, Karnok saw Todd Markowski, CNP, for pain management. (Tr. 425, 741, 891). She reported that her pain was gradually improving, but inactivity made it worse. (Tr. 425, 741, 891). She said that she had cervical injections and took Ultram and Neurontin, but her Neurontin gave her nausea. (Tr. 425, 741, 891). On examination, Markowski noted that Karnok had full strength, normal reflexes and sensation, and 2/18 fibromyalgia tender points.

(Tr. 426, 742, 892).  Markowski increased her Neurontin dosage and continued her Ultram. (Tr. 427, 744, 894).  On October 17, 2013, Karnok told Markowski that her pain was gradually worsening, got worse with cold weather, and was not relieved by Ultram or ibuprofen.  (Tr. 400, 697).  Markowski did not note any significant changes on examination and adjusted Karnok's medications.  (Tr. 400-01, 698-99).

On April 27, 2013, Karnok told Alicia Ganelli, CNP, that she had chronic muscle aches and pain in her throat and abdomen.  (Tr. 922).  On examination, Ganelli noted that Karnok was not in any distress, was oriented, and had no noted physical abnormalities.  (Tr. 922).  Ganelli prescribed Karnok acyclovir.  (Tr. 922).

On November 14, 2013, Karnok told Yashar Eshraghi, MD, that she had gradually worsening pain, which got worse when she bent forward or rotated.  (Tr. 692, 1036).  She said that tramadol did not help her pain.  (Tr. 692, 1036).  On examination, Karnok was alert, was in no distress, and had tenderness in her paraspinal muscles.  (tr. 695, 1039).  Dr. Eshraghi diagnosed Karnok with fibromyalgia, prescribed Zanaflex and Topamax, and ordered physical therapy.  (Tr. 695, 1039).

On December 10, 2013, Karnok told rheumatologist Ingrid Cobb, MD, that she had pain everywhere due to fibromyalgia, her legs burned at night, it hurt to walk, and she could not sit or stand long.  (Tr. 393, 683, 1057).  She said that stress caused her pain to flare up, she did not exercise, and she gained 15 pounds over the previous year.  (Tr. 393, 683, 1057).  On examination, Dr. Cobb noted that Karnok had full range of motion, no swelling, some tenderness in her upper and lower extremities, and full strength.  (Tr. 394, 684, 1058).  Dr. Cobb prescribed exercise, improved diet, stress management, and Cymbalta.  (Tr. 395, 685, 1059).

On April 2, 2014, Karnok told Markowski that her Topamax and Cymbalta did not help her pain.  (Tr. 386, 668, 1108).  Although Karnok complained that her pain was in her whole

body, she said it was mostly in her knees. (Tr. 386, 668, 1108). Markowski noted that an x-ray of Karnok's back was normal. (Tr. 386, 668, 1108). On examination, Karnok had full strength, normal reflexes and sensation, and 0/18 fibromyalgia tender points. (Tr. 386, 668, 1109). Markowski recommended back protection and a program to improve back strength and flexibility, refilled her Topamax prescription, and referred her for lidocaine injections and a fibromyalgia clinic. (Tr. 387, 669, 1110). On August 12, 2014, Markowski noted that Karnok had refused lidocaine infusions. (Tr. 376, 645, 1184). On examination, Markowski noted that Karnok had full strength, normal reflexes and sensation, and 2/18 fibromyalgia tender points. (Tr. 376, 645, 1184-85). Markowski prescribed Lyrica. (Tr. 377, 646, 1185). On January 25, 2017, Karnok told Markowski that her medications helped her pain and enabled her to perform her daily living activities without side effects. (Tr. 1784). On examination, Markowski noted that Karnok had a normal gait, normal back, full strength in all extremities, and tenderness in her lumbar spine and knee. (Tr. 1789). Markowski prescribed prednisone to help Karnok's lumbar spine pain. (Tr. 1790).

On May 20, 2015, Karnok told Cheung Cho Yue, MD, that she had pain in her wrists, hands, knees, lower back, ankle, and feet. (Tr. 1254). She said her feet swelled in the morning. (Tr. 1254). On examination, Dr. Yue noted that Karnok had full range of motion in her neck, shoulders, arms, and lower extremities. (Tr. 1255). She had no swelling, but many tender points. (Tr. 1255). Dr. Yue diagnosed Karnok with fibromyalgia and suggested that Karnok use aerobic exercise, aquatic therapy, yoga, and tai chi to reduce her fibromyalgia symptoms. (Tr. 1256).

On July 9, 2015, Sherry Hiller, MD, took diagnostic images of Karnok's lumbar spine. (Tr. 781). The images revealed no fractures, compressions, or acute bony abnormalities;

however, there was mild degenerative disc disease with mild anterior osteolytic spurring at all levels. (Tr. 781).

On July 21, 2015, Karnok saw Jane Martinez, LISW, for behavioral health counseling. (Tr. 809). On examination, Martinez noted that Karnok was oriented, had logical and organized thought process, sustained attention/concentration, normal memory, and fair judgment/insight. (Tr. 809). At follow-ups on July 28, 2015, and August 17, 2015, Martinez did not note any significant changes in Karnok's condition. (Tr. 786-87, 803-04).

On August 10, 2015, Karnok saw Rajesh Tampi, MD, and Monisha Ahmed, MD, for a mental health assessment and medication management. (Tr. 792). Karnok told Dr. Tampi and Dr. Ahmed that she had been depressed for 11 years and that her fibromyalgia was a constant stressor because "no body listen[ed] to [her] and "they [told her] to go to physical therapy." (Tr. 792-93). Karnok noted that Ambien helped her sleep. (Tr. 792). On examination, Dr. Tampi and Dr. Ahmed noted that Karnok was oriented, had logical and organized thought process, sustained attention/concentration, normal memory, and fair judgment/insight. (Tr. 796). They prescribed Effexor and told Karnok to maintain her other medications and practice good sleep hygiene. (Tr. 797). On January 18, 2016, Dr. Tampi and Dr. Ahmed did not note any significant changes in Karnok's condition. (Tr. 1413-15).

On August 25, 2015, Karnok told Dr. Astley that her pain was gradually worse, and she had gained weight. (Tr. 1310). Karnok said that she had relief from laying down; tramadol helped, but she did not take it because she had run out; and injections had helped her pain in her 20s. (Tr. 1310). Karnok also said that she tried to diet and exercise at home. (Tr. 1313). On examination, Dr. Astley noted tenderness in Karnok's paraspinal muscles. (Tr. 1313). An MRI of Karnok's lumbar spine revealed that she had mild degenerative changes without significant narrowing or neural compression, and she had mild thickening of junctional zone, which might

have represented adenomyosis and small uterine leiomyoma. (Tr. 1321-22). Dr. Astley prescribed tramadol and Naprosyn, referred Karnok to physical therapy, and recommended a program to improve back strength and flexibility. (Tr. 1313). Dr. Astley gave Karnok steroid injections on October 2, 2015, November 10, 2015, and January 19, 2016. (Tr. 1354-55, 1396, 1411-12).

On October 12, 2015, Karnok told rheumatologist Nouman Syde, MD, that she had back pain that got worse when she laid down. (Tr. 1363). Karnok said that her back pain started radiating down her leg in July 2015, and that a steroid injection gave her relief for one day. (Tr. 1364). Karnok said that Lyrica kept her fibromyalgia symptoms under control, except in her left leg. (Tr. 1364). On examination, Dr. Syde noted that Karnok had tenderness in her paraspinal muscles, limited range of motion in her back and hips, full range of motion in her knees and ankles, no swelling, and preserved and symmetric muscle strength. (Tr. 1365). Dr. Syde diagnosed Karnok with lumbar degenerative disc disease, chronic low back pain, and radiculopathy. (Tr. 1365). He prescribed Zanaflex, recommended increased activity level, and referred Karnok to physical therapy. (Tr. 1365). Karnok told Dr. Syde that she did not have time for physical therapy and would perform stretching exercises on her own. (Tr. 1365).

On December 17, 2015, Karnok told Samhati Mondal, MD, that her back pain gradually improved after her steroid injections. (Tr. 1432). She said that her pain was intermittent with radiation to legs and some tingling or stabbing feeling in her legs. (Tr. 1432). She also said that her pain was worse when walking or laying down. (Tr. 1432). Karnok rated her pain as ranging between 5/10 and 10/10 and said that it caused sleeping problems. (Tr. 1432). On examination, Dr. Mondal noted that Karnok was oriented, in no distress, and had normal range of motion, normal gait, normal reflexes, no nerve deficits, and normal affect and judgment. (Tr. 1435).

Dr. Mondal continued Karnok's medications and recommended pool and physical therapy. (Tr. 1435).

On January 11, 2016, Karnok saw Eileen Coppola, CNP, for pain management. (Tr. 1423). She said that her pain was gradually worse, especially with forward flexion, standing, walking, and movement. (Tr. 1423). She had increased knee pain when walking. (Tr. 1423). She also said that tramadol reduced her pain, improved her ability to perform daily living activities, and had no adverse side effects. (Tr. 1423). On examination, Coppola noted that Karnok had no swelling or tenderness in her knee, no numbness, and a symmetric back. (Tr. 1426). Coppola continued Karnok's tramadol and recommended a program to improve back strength and flexibility. (Tr. 1426-27). At a follow-up on January 19, 2016, Coppola did not note any significant changes in Karnok's condition but increased her Lyrica prescription and continued to recommend a program to increase strength and flexibility. (Tr. 1407-11). On April 4, 2016, Karnok told Coppola that her knee felt like it was "locking," and she almost fell over. (Tr. 1442). Karnok said that an injection gave her relief for a week, but her pain was worse after that. (Tr. 1446). Coppola noted some swelling and crepitus in Karnok's knee, but there was no tenderness. (Tr. 1446). Coppola increased Karnok's Lyrica prescription, added Norco, discontinued Topamax, and continued her recommendation to improve strength and flexibility. (Tr. 1446-47). On May 24, 2016, Karnok told Coppola that her medications helped her pain and enabled to perform her daily living activities without side effects. (Tr. 1499). On examination, Coppola noted full strength, normal gait, and tenderness in the spine. (Tr. 1503-04). Coppola continued Karnok's medications, directed Karnok to continue physical therapy for her knee, and added a recommendation that she have physical therapy for her back. (Tr. 1503-04). On June 29, 2016, Coppola did not note any significant changes in Karnok's condition or treatment. (Tr. 1536-41).

On January 14, 2016, an x-ray of Karnok's left knee showed that she had adequately maintained joint spaces, no fracture, no dislocation, no destructive bone lesion, and small joint effusion. (Tr. 1440).

On April 18, 2016, an MRI of Karnok's left knee showed a longitudinal vertical tear through posterior horn of the medial meniscus, moderate to large suprapatellar joint effusion; however, the lateral meniscus was intact and there was no collateral ligamentous injury. (Tr. 1454-55, 1489).

On April 28, 2016, Karnok told Nicholas Sherry, PA-C, that she had left knee pain for 9 months, which was worse with ambulation and climbing stairs, and she had several instances of knee locking and catching. (Tr. 1478). Karnok said that Norco helped her pain. (Tr. 1478). On examination, Sherry noted that Karnok sat comfortably and had well-maintained joint spaces. (Tr. 1478). He did not note any significant physical problems. (Tr. 1478). Sherry recommended physical therapy and, if that failed, arthroscopic surgery. (Tr. 1478).

From May 18, 2016, through August 1, 2016, Karnok attended 8 physical therapy sessions. (Tr. 1489-94, 1512-14, 1520-22, 1528-30, 1550-53, 1563-65, 1571-73, 1586-89). At her initial session, Karnok told Nicole Grisak, PT, that she was given a knee brace that did not fit correctly and gave her minimal help. (Tr. 1491). Karnok said that she had difficulty dressing, showering, and getting in/out of the car. (Tr. 1492). She said that she could sit for up to 20 minutes and stand for up to 10 minutes, and her pain got worse from climbing stairs, ambulating, standing, and sitting too long. (Tr. 1492). On examination, Grisak noted slightly decreased strength in Karnok's legs, decreased range of motion, impaired gait/balance, and increased pain/difficulty with activity; however, she also noted that Karnok ambulated independently. (Tr. 1492-93). Grisak recommended that Karnok exercise at home, in addition to attending physical therapy. (Tr. 1494). At sessions on June 8, 22, and 29, 2016, Grisak and

Joseph Warszawski, PT, noted that Karnok was not compliant with her home exercise program or knee brace prescription. (Tr. 1512-14, 1520-22, 1528-30). On July 6, 2015, Tracy Adkins, PT, noted that Karnok had improved her range of motion in her left knee, and on July 18, 2016, her knee tightness was slightly improved. (Tr. 1552, 1573). On August 1, 2016, Karnok told Grisak that she was able to walk well for two days, and Grisak noted that Karnok had met her goal of being able to demonstrate 80-100% of her home exercise plan exercises. (Tr. 1587, 1589). Nevertheless, Karnok displayed "fair to poor" progress toward her goals and had continued difficulty and pain when walking. (Tr. 1588).

On August 3, 2016, Karnok told Dr. Astley that she had gradually worsening pain, but her pain medication had reduced her pain from 10/10 to 7/10 without adverse side effects. (Tr. 1594, 1597). An MRI of Karnok's lower spine showed mild degenerative changes in the lumbar spine without significant narrowing or neural compression and mild thickening of the junctional zone. (Tr. 1598-99). On examination, Dr. Astley noted tenderness in Karnok's paraspinal muscles. (Tr. 1598). Dr. Astley continued Karnok's Lyrica and physical therapy prescriptions. (Tr. 1598). On January 6 and May 2, 2017, Dr. Astley gave Karnok steroid injections in her lumbar spine. (Tr. 1716-17, 1796-97). Also, on January 6, 2017, Dr. Astley took an MRI of Karnok's right knee, which revealed a peripheral vertical tear of the medial meniscal root, but no significant internal derangement or cartilage loss. (Tr. 1724-25).

On October 3, 2016, Karnok saw Carlisa Washington, CNP, for pain management. (Tr. 1613). Karnok reported mild degenerative lumbar pain and bilateral knee pain, which was worse with standing, movement, and laying down. (Tr. 1613). Karnok said that Norco improved her pain and ability to perform daily living activities without side effects. (Tr. 1613). On examination, Washington noted that Karnok had a normal gait, normal back, full strength in all extremities, and tenderness in her lumbar spine and knee. (Tr. 1617). Karnok did not have any

edema, erythema, or crepitus in her knee. (Tr. 1619). Washington continued Karnok's Norco prescription. (Tr. 1618). On December 1, 2016, Washington noted no significant changes in Karnok's condition, prescribed Mobic, and discontinued Norco. (Tr. 1652-58). On January 3, 2017, Karnok reported relief in her right knee from an injection but said that her left knee was worse. (Tr. 1690). Washington noted that Karnok's medications continued to help and refilled them. (Tr. 1695-96). On March 7, 2017, Karnok reported weakness in her arms and legs, but said that her Ultram, Mobic, and Lyrica helped her pain and ability to perform daily living activities. (Tr. 1770). Washington noted that Karnok remained stable and functional, and she refilled Karnok's prescriptions. (Tr. 1775). On August 17, 2017, Washington noted that Karnok had 16/18 fibromyalgia tender points on examination, but there were no other significant changes in her physical condition. (Tr. 1830-36). On October 12, 2017, and January 4, 2018, Washington noted that Karnok had 18/18 fibromyalgia tender points and recommended that Karnok go to the fibromyalgia clinic at CCF; however, there were still no other significant changes in her condition, and she could perform her daily living activities. (Tr. 1861-67, 1896-1901). Washington continued Karnok's tramadol and Lyrica prescriptions. (Tr. 1867, 1902).

On October 3, 2016, an x-ray of Karnok's right knee showed no significant interval changes, no evidence of fracture or dislocation, small osteophytes, no evidence of joint effusion, and mild degenerative disease. (Tr. 1626).

On November 3, 2016, Karnok told Jamie Boyer, PA-C, that she had increasing pain in her right knee and that NSAID pain relievers did not help. (Tr. 1645). She said that she had previously used Voltaren gel with some relief, and that she was not able to get a knee brace. (Tr. 1645). On examination, Boyer noted that Karnok had a full range of motion, no erythema, no ecchymosis, no abnormalities in her lower extremities, and mild degenerative changes and

joint space narrowing in her right knee. (Tr. 1646). Boyer gave Karnok lidocaine and Kenalog injections in both her knees and wrist splints for carpal tunnel syndrome. (Tr. 1646). At a follow-up on February 3, 2017, Karnok said that her injections provided relief for one week, but her pain returned. (Tr. 1777). She said that her knees did not feel stable and her pain was worse with stair climbing and ambulation, but she wanted to use conservative treatment instead of surgery. (Tr. 1777). Boyer fitted Karnok for bilateral knee sleeves and recommended arthroscopic management of her knee pain. (Tr. 1777). He also noted that Karnok's insurance denied conservative treatment through viscosupplementation. (Tr. 1777).

On January 25, 2017, Karnok saw Daniel Malkamaki, MD, for a physical medicine and rehabilitation examination. (Tr. 1778). Karnok reported that she had a bad experience with physical therapy, 8/10 pain in her knee, and intermittent pain radiation down her legs. (Tr. 1778). Karnok said that her pain was worse when bending her knees or climbing stairs, but it was relieved by medication, rest, changing position, and heat. (Tr. 1778). On examination, Dr. Malkamaki noted that Karnok had good insight/judgment, pain in her left knee, moderate wasting in the right-side vastus medialis obliquus muscle stable ligaments, no obvious knee effusion, nearly full range of motion, crepitus on the right knee with end range extension. (Tr. 1782). Karnok had no deformity in her lumbar spine, mild paraspinal hyperionicity, limited lumbosacral range of motion, full strength and sensation in her upper and lower extremities, and a stable gait. (Tr. 1782). Based on his examination, Dr. Malkamaki stated determined that Karnok's condition could improve through treatment, medication, and home exercise. (Tr. 1783). Dr. Malkamaki said that, because "optimization of [Karnok's] care" would improve her functioning and enable her to "maintain at least a sedentary level job," it was 'difficult to conclude . . . that she meets strict SSD criteria." (Tr. 1783). Dr. Malkamaki's examination note never mentioned Karnok's fibromyalgia.

On March 20, 2017, Karnok told Dr. Tampi and Aarti Chhaitlani, MD, that she had stopped using Effexor because she believed it would cause serotonin syndrome if mixed with tramadol. (Tr. 1761). Karnok said that her pain kept her from sleeping, and she had gained weight. (Tr. 1761). On examination, Dr. Tampi and dr. Chhaitlani noted that Karnok had anxiety, logical and organized thought process, sustained attention/concentration, and fair judgment/insight. (Tr. 1761). They prescribed Zoloft and Atarax. (Tr. 1763). At follow-ups on April 17 and June 19, 2017, Karnok told Dr. Tampi and Dr. Chhaitlani that her condition had not changed, but she was compliant with her medications. (Tr. 1748, 1750-51, 1815). Dr. Tampi and Dr. Chhaitlani noted that Karnok's anxiety had improved, continued her prescriptions, and recommended that she practice good sleep hygiene. (Tr. 1751, 1815).

On September 15, 2017, Joseph Hanna, MD, took an MRI of Karnok's spine, which revealed mild spinal canal stenosis at C5-C6 due to disc osteophyte complex. (Tr. 1854). Karnok's spine was otherwise normal. (Tr. 1854).

    **C.**    **Relevant Opinion Evidence**

        **1.**    **Examining Physician Opinion – Dr. Mitchell Wax, Ph.D.**

On November 4, 2014, Mitchell Wax, Ph.D., conducted a psychological evaluation of Karnok. (Tr. 763-68). Karnok told Dr. Wax that, in addition to anxiety and depression, she had trouble concentrating due to her pain. (Tr. 763). Karnok said that, in a typical day, she woke up around 5:00 AM and went to bed around 9:00 PM. (Tr. 765). She did not cook regularly because her daughter-in-law cooked, but she helped prepare meals. (Tr. 765). She bathed daily, cleaned dishes twice a week, did her own laundry, vacuumed twice a week, and went to the grocery store every two weeks. (Tr. 765). In the mornings she drank coffee, watched TV, and did housework. (Tr. 765). Karnok had logical, coherent, and goal-directed thought and speech content, but she was passive-aggressive and gave 'vague and circumstantial" responses.

(Tr. 765).  Dr. Wax found evidence of mental confusion and that Karnok "would not or could not concentrate to answer questions . . . possibly due to her being in pain."  (Tr. 766).  She also had some memory problems.  (Tr. 766).  Dr. Wax estimated that Karnok's IQ was in the low average range and determined that she would be able to understand, remember, and carry out instructions.  (Tr. 767).  He determined that Karnok would have difficulty maintaining attention, concentration, and persistence due to her pain and depression.  (Tr. 767).  He also said that Karnok would have difficulty responding appropriately to supervisors, coworkers, and regular work pressures.  (Tr. 767-68).

### 2.    Examining Physician – Khalid Darr, MD

On July 9, 2015, Khalid Darr, MD, conducted a physical examination of Karnok. (Tr. 772-79).  Karnok told Dr. Darr that she had temporary relief from pain management and epidural blocks.  (Tr. 772).  She said that changes in weather, damp weather, prolonged standing, walking, bending, pulling, and pushing made her back pain worse.  (Tr. 772).  Dr. Darr noted that Karnok ambulated with a normal gait, did not use any handheld assistive device, and had normal intellectual functioning.  (Tr. 773).  There was no tenderness or other issues in Karnok's upper and lower extremities, and she had full grip strength.  (Tr. 774).  Her cervical spine was not tender.  (Tr. 774).  She had some loss of range of motion in her dorsolumbar spine, but there was no tenderness and Karnok was able to stand on one leg at a time without difficulty. (Tr. 774).  Karnok had full muscle strength, and she was able to walk on her heels and toes, perform tandem gait, and squat without difficulty.  (Tr. 775).  Dr. Darr determined that Karnok could push and pull without limitations, operate hand and foot controls, climb stairs, lift 20 to 25 pounds frequently, and lift over 20 pounds occasionally.  (Tr. 775).  Dr. Darr determined that, apart from lower back pain, Karnok's condition was otherwise unremarkable.  (Tr. 773).

### 3.    Examining Physician Opinion – Dr. Daniel Malkamaki, MD

On January 27, 2017, Dr. Malkamaki completed a medical source statement, indicating his evaluation of Karnok's physical capacity. (Tr. 1744-45). Dr. Malkamaki opined that Karnok would be able to frequently lift/carry one to two pounds and occasionally lift two to three pounds, due to mild degenerative disc disease in her lumbar spine and mild osteoarthritis in her knees. (Tr. 1744). He stated that Karnok could stand/walk for 2 to 3 hours total, and 15 to 30 minutes at a time. (Tr. 1744). She could sit for 5 to 6 hours total and up to 30 minutes at time. (Tr. 1744). Dr. Malkamaki indicated that Karnok could rarely climb, balance, stoop, crouch, kneel, and crawl; however, she could frequently reach, push, pull, and manipulate objects. (Tr. 1745). He indicated that Karnok would need to be restricted from exposure to moving machinery and temperature extremes. (Tr. 1745). He said that Karnok was prescribed a cane and needed to be able to alternate positions at will. (Tr. 1745). Dr. Malkamaki indicated that Karnok had moderate pain, which did not interfere with her concentrate, take her off task, or cause absenteeism. (Tr. 1745). At the end of his evaluation, Dr. Malkamaki stated, "Patient appears to be able to work at a sedentary to light duty level job for gainful employment with the restrictions above." (Tr. 1745).

### 4.    State Agency Consultants

On December 16, 2014, state agency consultant Diane Manos, MD, reviewed Karnok's medical and other records and adopted ALJ Frederick Andreas' March 15, 2013, physical RFC assessment. (Tr. 207-09). Dr. Manos stated that Karnok could lift and/or carry up to 10 pounds frequently and up to 20 pounds occasionally. (Tr. 208). Karnok could stand/walk up to 6 hours and sit up to 6 hours in an eight our workday. (Tr. 208). She could frequently climb ramps/stairs and balance, and she could occasionally climb ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl. (Tr. 208). Dr. Manos also indicated that Karnok had to avoid concentrated exposure to

hazards, such as machinery and heights. (Tr. 208). On August 3, 2015, Teresita Cruz, MD, concurred with Dr. Manos' assessment and adoption of ALJ Andreas' RFC assessment. (Tr. 193).

**D.    Relevant Testimonial Evidence**

Karnok testified at the ALJ hearing. (Tr. 96-126). Karnok said that she had no difficulties reading and writing, and she had a driver's license but did not drive. (Tr. 99). She said she did not drive because she had no car, and she had trouble pushing the gas and brake pedals with her legs. (Tr. 99-100). Karnok lived with her brother. (Tr. 104). She said that she had difficulty getting up in the morning, and, once she was up, she drank coffee, helped out with the house, and helped out with her nieces and nephews. (Tr. 104). She said that she cleaned dishes, changed diapers, and fed the children, but she did not much house cleaning or any cooking. (Tr. 105). She stood when she did the dishes, but she took regular breaks to help with the babies in her house. (Tr. 105). Karnok said that she could lift about 10 to 15 pounds comfortably, and that she could barely lift her niece who weighed "about 18 pounds." (Tr. 121). Karnok said that two or three times a week, she stayed in her room for the majority of the day, due to both her pain and depression. (Tr. 125).

Karnok testified that her knees and back were "a lot worse" than they were during her March 2013 ALJ hearing. (Tr. 100). She said that her back hurt constantly, which prevented her from lifting and bending, and she had trouble standing or sitting too long. (Tr. 100). Karnok said that she could stand for 10 minutes at a time, and she could sit for 10 to 20 minutes at a time. (Tr. 100-01). Karnok said that, if she sat for too long, she would feel stiff and need to stand or move around. (Tr. 101). Karnok said that her knees locked up, and that walking or going up and down steps was difficult. (Tr. 101). Karnok also said that she had fibromyalgia, which caused constant pain from her neck down and made her body feel like it was "on fire."

(Tr. 102-03). Further, Karnok said that she was stressed and depressed due to her physical issues, unemployment, and "bouncing around" between family members. (Tr. 103, 110-11). Karnok also had carpal tunnel syndrome in both her hands and migraine headaches three times a month. (Tr. 110, 119-20). Karnok testified that she was in pain management and received injections for her knee and back pain, but they did not help her knees and gave her only temporary relief in her back. (Tr. 101-02, 104, 106, 108-09). She also took tramadol, Lyrica, and Mobic for pain, arthritis, and fibromyalgia. (Tr. 102). Karnok said that she had physical therapy for her knees, but her therapists "didn't continue" because "there was really nothing they could do." (Tr. 103). Karnok had medication and counseling to help with her mental health symptoms. (Tr. 109-10).

Karnok testified that she looked for jobs, but she did not believe that she could work if the job required standing or sitting too long. (Tr. 118). She said that she needed a job where she could "at least rotate, have that option to try to stand or try to sit." (Tr. 118).

Thomas Nimberger[2], a vocational expert ("VE"), also testified at the ALJ hearing. (Tr. 126-34). The ALJ asked the VE whether a hypothetical individual with Karnok's background and age could work if she was limited to light work, except that:

> she can frequently use ramps and stairs; able to occasionally climb ladders, ropes, or scaffolds; able to frequently balance; able to occasionally stoop, kneel, crouch, and crawl. This individual must avoid concentrated exposure to unprotected heights, and now the individual's further limited to simple, routine tasks with no strict time demands, no strict production quotas, only simple work instructions and decisions and no more than minimal or infrequent changes in the work setting. Further, the individual is limited to occasional interaction with supervisors and occasional and superficial interaction with the public and coworkers.

---

[2] The ALJ's decision identifies the VE as Thomas Nimberger, which is the name on the VE's curriculum vitae. (Tr. 367). The transcript uniformly identifies him as John Nimberger, probably indicating the transcriber misunderstood the VE when he gave his name.

(Tr. 127, 129-30). The VE testified that such an individual could work as a packager, wire worker, or mail clerk. (Tr. 130). The ALJ asked whether the individual in the first hypothetical could work if she were to "be afforded the opportunity to alternate positions between sitting and standing at approximately 30-minute intervals . . . [while] remain[ing] at the work station." (Tr. 130-31). The VE said that the individual could not perform the previously identified jobs, but could work at the sedentary level as a polisher, mailing house worker, or document preparer. (Tr. 131-32). The VE testified that, if the sit/stand option were removed and the first hypothetical was reduced to sedentary work, the second set of jobs would still be available. (Tr. 132).

Karnok's counsel asked the VE what the parameters for off-task behavior would be. (Tr. 133). The VE testified that there was no issue with 1 to 10 percent off-task behavior; however, 20 percent off-task behavior would be a major issue. (Tr. 133). The VE said that between 10 to 20 percent off-task behavior was a statistically "gray area." (Tr. 133). The VE also testified that two or more regular absences per month would be work-preclusive. (Tr. 134).

## IV.     The ALJ's Decision

The ALJ's May 2, 2018, decision found that Karnok was not disabled and denied her application for SSI. (Tr. 45-54). The ALJ noted that, although Karnok was previously adjudicated not disabled from July 17, 2010, through March 15, 2013, the earlier decision did not bind the ALJ because Karnok presented new, material evidence of additional severe impairments and an increase in severity of her mental impairments. (Tr. 45). The ALJ found that Karnok had the severe impairments of: "cervical degenerative disc disease, lumbar degenerative disc disease, bilateral knee degenerative joint disease, fibromyalgia, obesity, depressive disorder, and anxiety disorder. (Tr. 47). Nevertheless, the ALJ determined that Karnok had no impairments or combination of impairments that met or medically equaled the severity of any of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 48) (specifically noting that the ALJ considered SSR 12-2p).

> The ALJ determined that Karnok had the RFC to perform light work, except that:
>
> She can occasionally use ladders, ropes or scaffolds; she can occasionally stoop, kneel, crouch and crawl; she can frequently balance and use ramps or stairs; and she must avoid concentrated exposure to unprotected heights.  The claimant is further limited to simple, routine tasks with no strict time demands, no strict production quotas, only simple work instructions and decisions, and no more than minimal or infrequent changes in the work setting; and she is limited to occasional interaction with supervisors, and occasional and superficial interaction with the public.

(Tr. 50).  In assessing Karnok's RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the medical and other evidence in the record.  (Tr. 50).  The ALJ found that Karnok had only a "moderate limitation" in concentrating, persisting, and maintaining pace – noting specifically that MetroHealth treatment records indicated that she had sustained attention and concentration.  (Tr. 49).  The ALJ also noted that Karnok had pain due to her multiple physical impairments, including her fibromyalgia diagnosis.  (Tr. 50).  The ALJ noted that Karnok had numerous MRIs and x-rays from 2015 through 2017, including an April 4, 2016, MRI showing a tear in her meniscus with moderate joint effusion.  (Tr. 51).  He also noted that physical examinations showed tenderness and fibromyalgia trigger points, but she: (1) had normal sensation, normal muscle strength, and normal reflexes on most occasions; and (2) controlled her symptoms through medications, steroid injections, and physical therapy.  (Tr. 51).  Further, the ALJ found that Karnok's obesity aggravated her fibromyalgia and other impairments and affected her ability to perform a limited range of light work.  (Tr. 51).  Based on his review of the evidence in the record and Karnok's own statements about her impairments, the ALJ determined that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence,

and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence."  (Tr. 52).

The ALJ stated that he gave "significant weight" to Dr. Manos' and Dr. Cruz's opinions, because their opinions that Karnok could perform a range of light work was consistent with the evidence in the record.  (Tr. 52).  Nevertheless, the ALJ noted that Dr. Manos and Dr. Cruz had adopted the prior ALJ's RFC assessment, despite new and material evidence establishing additional severe impairments and limitations.  (Tr. 52).  The ALJ also stated that he gave "limited weight" to Dr. Malkamaki's opinion, because: (1) objective evidence in the record did not support the extreme limitations in it; and (2) the extreme limitations Dr. Malkamaki gave were inconsistent without his opinion that Karnok could perform sedentary to light work. (Tr. 52-53).

Because the ALJ found that Karnok could not perform all or substantially all of the requirements of light work, he relied on the VE's testimony to determine whether Karnok could work.  (Tr. 53-54).  Based on the VE's testimony, the ALJ found that Karnok was "able to perform the requirements of representative occupations such as packager, wireworker, and mail clerk."  (Tr. 54).  In light of his findings, the ALJ determined that Karnok was not disabled from August 18, 2014 – the date of the application – through the date of his decision and denied Karnok's application for SSI.  (Tr. 54).

## V.     Law & Analysis

### A.      Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person

would accept as adequate to support a conclusion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 42 U.S.C. 383(c)(3); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant

evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. § 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. § 416.912(a).

### B.      Dr. Malkamaki's Opinion

Karnok argues that the ALJ violated the treating physician rule when he gave "limited weight" to Dr. Malkamaki's opinion and "substantial weight" to Dr. Manos' and Dr. Cruz's opinions.  ECF Doc. 12 at 10-13.  She asserts that the ALJ failed to apply proper legal standards because he did not explain whether he treated Dr. Malkamaki as a treating physician, and because the ALJ's reasons for rejecting Dr. Malkamaki's opinion – that it was internally inconsistent and unsupported by the objective medical evidence – were not good reasons.  ECF

Doc. 12 at 12. Karnok contends that the ALJ should have instead given Dr. Malkamaki's opinion greater weight because he performed an in-depth examination, he had access to all of her MetroHealth records, and the restrictions in his opinion were consistent with other medical evidence. ECF Doc. 12 at 11-12. Karnok also argues that the ALJ erred by giving Dr. Manos' and Dr. Cruz more weight than he gave Dr. Malkamaki's decision, because: (1) the Sixth Circuit has said treating and examining physicians' opinions are due greater weight than non-examining physicians' opinions; (2) they never had access to the 2016 and 2017 MRI studies showing Karnok's bilateral torn menisci; (3) they accepted the previous ALJ's findings; (4) they did not actually examine Karnok; and (5) other evidence in the record did not support their opinions regarding Karnok's ability to stand/walk. ECF Doc. 12 at 10, 13.

The Commissioner responds that Dr. Malkamaki – as a one-time examiner – was not a treating physician, and the ALJ was not required to provide "good reasons" for rejecting his opinions. ECF Doc. 14 at 6-7. Nevertheless, the Commissioner argues that the ALJ adequately explained that Dr. Malkamaki's opinion was due "limited weight" because the objective evidence did not support the extreme limitations in the opinion – such as lifting no more than three pounds and not performing any postural tasks. ECF Doc. 14 at 8. Specifically, the Commissioner asserts that the generally normal findings (full range of motion, stable gait, and intact strength, sensation, and reflexes), as well as the inconsistency between Dr. Malkamaki's extreme limitations and statements that Karnok could perform "at least" sedentary work to light work, supported the ALJ's decision to give Dr. Malkamaki's opinion limited weight. ECF Doc. 14 at 8. Finally, the Commissioner contends that the ALJ was permitted to give the Dr. Manos' and Dr. Cruz's opinions substantial weight because the ALJ considered the entire medical record – including the later MRIs – and found their opinions were consistent with the record. ECF Doc. 14 at 8-10.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. § 416.927(c). An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)). Good reasons for rejecting a treating physician's opinion may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. § 416.927(c). Inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 416.927(c)(2)-(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. § 416.927(c). Nevertheless, the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*,

710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned.").  When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate.  *Cole*, 661 F.3d at 939.

"[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'"  *Gayheart*, 710 F.3d at 376.  Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion.  *Id.*; 20 C.F.R. § 416.927(c).  Generally, an examining physician's opinion is due more weight than a nonexamining physician's opinion.  20 C.F.R. § 416.927(c)(2); *Gayheart*, 710 F.3d at 375.  An ALJ does not need to articulate good reasons for rejecting a nontreating or nonexamining opinion.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions).  An ALJ may rely on a state agency consultant's opinion and may give it greater weight than other nontreating physician's opinions if it is supported by the evidence.  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015).  Further, an ALJ may rely on a state agency consultant's opinion that predates other medical evidence in the record, if the ALJ takes into account any evidence that the consultant did not consider.  *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009).

The ALJ applied proper legal standards in weighing Karnok's medical evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125. The ALJ complied with the regulations by specifically stating that Dr. Malkamaki's opinion was due only "limited weight," and that he gave "significant weight" to Dr. Manos' and Dr. Cruz's opinions. 20 C.F.R. § 416.927; (Tr. 52-53). Here, Karnok's argument that the ALJ failed to comply with the regulations by not explaining whether he considered Dr. Malkamaki a treating physician is meritless. Nothing in the regulations requires an ALJ to expressly state whether he does or does not consider a physician a "treating physician" – especially when, as here, it is clear from the record that the physician in question was a one-time examiner and not a treating physician. *See* 20 C.F.R. § 416.927(c); *see also* (Tr. 1778-83) (sole examination by Dr. Malkamaki, evaluating Karnok's physical function to determine whether she met disability criteria). Because Dr. Malkamaki, Dr. Manos, and Dr. Cruz were not treating sources, the ALJ was not required to give any of them controlling weight, or explain his reasons for giving "limited weight" to Dr. Malkamaki's opinion. 20 C.F.R. § 416.927(c); *Gayheart*, 710 F.3d at 376; *Smith*, 482 F.3d at 876. Nevertheless, the ALJ adequately explained that: (1) Dr. Malkamaki's opinion was not supported by objective evidence in the record and it was inconsistent internally and with Dr. Malkamaki's own treatment notes; and (2) Dr. Manos' and Dr. Cruz's opinions were consistent with other evidence in the record. (Tr. 52-53). Moreover, the ALJ was permitted to give Dr. Manos' and Dr. Cruz's opinions greater weight than Dr. Malkamaki's opinion because the ALJ considered all the evidence in the record – including Karnok's 2016 and 2017 MRIs and x-rays – and found their opinions consistent with that evidence. *Reeves*, 618 F. App'x at 274; *McGrew*, 343 F. App'x at 32; (Tr. 50-53).

Substantial evidence also supported the ALJ's reasons for giving Dr. Malkamaki's opinion "limited weight" and Dr. Manos' and Dr. Cruz's opinions "significant weight." 42

U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125.  Dr. Malkamaki's opinion was internally inconsistent and inconsistent with his own treatment notes, because: (1) his opinion that Karnok could perform "a sedentary to light duty level job" was inconsistent with the extreme lifting and postural restrictions he gave; and (2) the extreme lifting limitations and statement that Karnok required a cane were inconsistent with his own examination findings, that Karnok had nearly full range of motion, a stable gait, and full strength in her upper and lower extremities, *Compare* (Tr. 1744-45), *with* (Tr. 1778-83); *see also* 20 C.F.R. § 416.967(b) (Light work requires claimants to be able to lift up to 10 pounds frequently and 20 pounds at a time, and do "a good deal of walking or standing or . . . sitting with some pushing and pulling of arm or leg controls.").  Other evidence in the record was also inconsistent with Dr. Malkamaki's opinion, including treatment notes that regularly indicated that Karnok: (1) had mildly-restricted to full range of motion, full strength in her upper and lower extremities, and a normal gait; (2) could improve through home exercise or physical therapy; and (3) was able to control her pain through medication, enabling her to perform daily living activities.  (Tr. 376, 386-87, 394-95, 413, 426, 440-41, 489, 492-96, 645, 668-69, 684, 695, 718, 742, 865, 892, 959, 1039, 1058, 1108-10, 1184-85, 1235-37, 1255-56, 1365, 1407-11, 1423-27, 1435, 1446-47, 1478, 1489-94, 1499, 1503-04, 1512-14, 1520-22, 1528-30, 1550-53, 1563-65, 1571-73, 1586-89, 1598, 1613, 1646, 1652-58, 1770, 1775, 1784, 1789).  Moreover, that same evidence – along with Karnok's own testimony that she was able to regularly lift 10 to 15 pounds and occasionally lift her 18-pound niece – was consistent with Dr. Manos' and Dr. Cruz's opinions that Karnok could lift and or carry up to 10 pounds frequently and up to 20 pounds occasionally, could stand/walk up to 6 hours in one day, and could sit up to 6 hours in one day.  *Id.*; (Tr. 125, 193, 208).

Thus, because substantial evidence supported the ALJ's conclusions regarding the consistency of Dr. Malkamaki's, Dr. Manos', and Dr. Cruz's opinions with the other evidence in

the record, his decision to give "limited weight" to Dr. Malkamaki's opinion and "significant weight" to Dr. Manos' and Dr. Cruz's opinions fell within the Commissioner's "zone of choice." *Mullen*, 800 F.2d at 545. Accordingly, Karnok's argument that the ALJ erred in weighing the medical evidence is without merit.

### C.     Fibromyalgia Evaluation under SSR 12-2p

Karnok argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in evaluating her fibromyalgia. ECF Doc. 12 at 14-17. Karnok asserts that, although the ALJ properly found that her fibromyalgia was a medically determinable impairment that he was required to consider in determining her RFC, the ALJ failed to adequately evaluate the effects of her fibromyalgia on her ability to work. ECF Doc. 12 at 14. Specifically, Karnok contends that the ALJ placed too much of his focus on objective signs, such as range of motion and strength findings, rather than her subjective symptom complaints. ECF Doc. 12 at 14-15. Further, Karnok asserts that her subjective complaints were consistent with findings that she had 18/18 tender points and required physical therapy, steroid injections in her knees and back, anti-inflammation and anti-spasm medications, and narcotic and nerve pain medications. ECF Doc. 12 at 16-17. Finally, Karnok argues that the ALJ should have found that her fibromyalgia significantly limited her ability to sustain competitive employment her pain made her unable to stay on task and caused absenteeism. ECF Doc. 12 at 17.

The Commissioner responds that Karnok's fibromyalgia diagnosis did not automatically entitle her to disability benefits. ECF Doc. 14 at 10. Instead, the Commissioner argues that the ALJ adequately complied with the regulations when he considered clinical observations of Karnok's tender points, treatment measures, and other health concerns that affected her fibromyalgia and ability to work (such as her obesity). ECF Doc. 14 at 11. The Commissioner

asserts that Karnok has not pointed to any specific limitation from her fibromyalgia that the ALJ failed to consider, and that even if she could point to evidence supporting her belief that she was disabled, the existence of such evidence would not automatically mean that other evidence did not support the ALJ's conclusions. ECF Doc. 14 at 11-12. Moreover, the ALJ notes that despite Karnok's claims that she had 18/18 tender points and would be off task or absent due to her fibromyalgia, other clinical findings show that she had two or less tender points and no treating source ever indicated that she could not perform light work. ECF Doc. 14 at 11.

Because fibromyalgia is a common, but complex, medical condition involving a constellation of joint, muscle, and connective tissue symptoms, the Social Security Administration issued SSR 12-2p, 2012 SSR LEXIS 1 (Jul. 25, 2012), as a framework for determining whether a claimant's fibromyalgia is disabling. Under that framework, an ALJ must determine whether the claimant's fibromyalgia: (1) is a medically determinable impairment; (2) singly or in combination with other medically determinable impairments, causes functional limitations that medically equal a listed impairment; and (3) causes any exertional or nonexertional limitations that reduce the claimant's RFC. SSR 12-2p, 2012 SSR LEXIS 1 *16-19 (noting that these inquiries fit within the five-step sequential evaluation process applied in all adult claims).

As with other types of disability claims, SSR 12-2p requires the ALJ to rely on objective medical evidence to establish the presence of fibromyalgia as a medically determinable impairment. Id. at *9-10. The ALJ must consider whether the longitudinal record includes evidence from an acceptable medical source that: (1) the claimant has a history of widespread pain in all quadrants of the body; (2) the claimant has at least 11 positive tender points bilaterally and both above and below the waist; and (3) other disorders that might cause the same signs or symptoms were ruled out. Id. at *5-10. Other evidence, including treatment notes and opinions

from providers who are not acceptable medical sources and statements from nonmedical sources, may also be considered in evaluating whether the claimant's fibromyalgia causes functional limitations that equal a listing or causes exertional or nonexertional limitations that reduce the claimant's RFC. *Id.* at *10-12, 17-18. Common fibromyalgia symptoms that may cause limitations include pain and fatigue, and some claimants with fibromyalgia may require both postural and environmental restrictions. *Id.* at *18-19.

Fibromyalgia pain is one of the more complex issues for an ALJ to analyze. Ordinarily, a claimant must substantiate her pain complaints by pointing to objective medical evidence that her medical condition: (1) actually caused severe pain; or (2) is so severe that it would be reasonably expected to cause the alleged pain. *Blankenship*, 874 F.2d at 1123 (citing *McCormick v. Sec'y of Health & Hum. Servs.*, 861 F.2d 998, 1003 (6th Cir. 1988), and *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847 (6th Cir. 1986)). But objective evidence is often unavailable when fibromyalgia is the underlying condition. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007); *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (noting that, due to the "elusive" and "mysterious" nature of fibromyalgia, medical evidence confirming the alleged severity of the impairment almost never exists). When the severity and limiting effects of fibromyalgia pain cannot be confirmed by objective medical evidence, the ALJ must:

> consider all of the evidence in the case record, including the [claimant's] daily activities, medications or other treatments the [claimant] uses, or has used, to alleviate symptoms; the nature and frequency of the [claimant's] attempts to obtain medical treatment for symptoms; and statements by other people about the [claimant's] symptoms.

SSR 12-2p, 2012 SSR LEXIS 1 *14; *see also* SSR 16-3p, 2016 SSR LEXIS 4 *15-19 (Oct. 25, 2017); 20 C.F.R. § 416.929(c)(3). An ALJ is not required to accept a claimant's subjective complaints about her pain, but may instead discount the claimant's testimony when it is

inconsistent with objective medical and other evidence.[3]  *See Jones,* 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4 *15 ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").  If the ALJ discounts or rejects the claimant's subjective complaints, he must state clearly his reasons for doing so with sufficient detail to permit meaningful review.  *See Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994).  Nevertheless, the ALJ need not explicitly discuss each factor in his discussion or incorporate all the information upon which he relied into a single tidy paragraph.  *See Renstrom v. Astrue,* 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Buckhannon ex rel. J.H. v. Astrue,* 368 F. App'x 674, 678–79 (6th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

The ALJ applied proper legal standards – including SSR 12-2p – and reached a conclusion supported by substantial evidence in evaluating Karnok's fibromyalgia.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam,* 348 F.3d at 125.  As an initial matter, Karnok specifically states that she agrees with the ALJs determination that her fibromyalgia was a medically determinable impairment and does not raise any argument regarding the ALJ's listings analysis at Step Three.

---

[3] In explaining the importance of "other evidence," SSR 16-3p provides that:

> We will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled . . .. If we cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. Other evidence that we will consider includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in our regulations.

SSR 16-3p, 2016 SSR LEXIS 4 *10-11.

*See generally* ECF Doc. 12 at 14-17.  Instead, she argues only that the ALJ focused too much on objective medical evidence when he should have relied more on her subjective complaints regarding the effects of her fibromyalgia pain.  *Id.*  But a review of the record shows that the ALJ neither over-relied on the objective medical evidence nor ignored Karnok's subjective complaints.  Instead, the ALJ complied with SSR 12-2p, SSR 16-3p, and 20 C.F.R. § 416.929(c)(3) by evaluating Karnok's subjective complaints in light of the longitudinal record, including the objective medical evidence, medical opinions, Karnok's testimony about her activities and efforts to treat her symptoms, and Karnok's statements to treatment providers. (Tr. 47-53).  Further, the ALJ did not outright reject Karnok's complaints regarding her impaired concentration and attention – notwithstanding his acknowledgement that treatment notes indicated she had sustained concentration and attention.  (Tr. 49).  Instead, the ALJ found that Karnok had a moderate limitation in that domain, and the ALJ controlled for it by limiting her to "simple, routine tasks with no strict time demands, no strict production quotas, only simple work instructions and decisions, and no more than minimal or infrequent changes in the work setting." (Tr. 49-50).  Further, the ALJ adequately explained that, notwithstanding the objective and testimonial evidence establishing Karnok's fibromyalgia pain, tender points, and other physical impairments, she: (1) maintained full strength, sensation, and reflexes; and (2) was able to adequately control her symptoms through medication, steroid injections, and physical therapy. *Jones*, 336 F.3d at 475-76; *Felisky*, 35 F.3d at 1036; SSR 16-3p, 2016 SSR LEXIS 4 *15; (Tr. 50-52).

Substantial evidence also supported the ALJ's conclusions that Karnok's fibromyalgia did not cause any more limitations than those he included in his RFC finding, including: (1) treatment notes indicating that Karnok had mildly-restricted to full range of motion, had full strength and sensation, had a normal gait, could improve through exercise and physical therapy,

and controlled her pain through medications, enabling her to perform daily living activities; (2) notes indicating that, for much of the relevant period, Karnok had only 0 to 2 out of 18 fibromyalgia tender points; (3) treatment notes regularly indicating that Karnok had logical and organized thought process, sustained attention/concentration, and normal memory; and (4) Karnok's own testimony and statements indicating that she could exercise on her own, occasionally lift her 18-pound niece, care for the children in her brother's house, and work so long as she had a sit/stand option. (Tr.104-05, 118, 121, 376, 386-87, 394-95, 413, 426, 440-41, 489, 492-96, 645, 668-69, 684, 695, 718, 726-27, 742, 746-47, 786-87, 796, 803-04, 809, 865, 892, 959, 1039, 1058, 1108-10, 1184-85, 1235-37, 1255-56, 1313, 1365, 1407-15, 1423-27, 1435, 1446-47, 1478, 1489-94, 1499, 1503-04, 1512-14, 1520-22, 1528-30, 1550-53, 1563-65, 1571-73, 1586-89, 1598, 1613, 1646, 1652-58, 1748, 1750-51, 1761, 1770, 1775, 1782-84, 1789, 1815). Because substantial evidence supported the ALJ's conclusions regarding the limiting effects of Karnok's fibromyalgia, this court may not disturb the ALJ's findings – even if the same or other evidence might have supported a different conclusion. 42 U.S.C. 383(c)(3); *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241.

Accordingly, because the ALJ applied proper legal standards – including following the framework under SSR 12-2p – and reached a decision supported by substantial evidence in evaluating Karnok's fibromyalgia, the ALJ's conclusion that Karnok's fibromyalgia did not cause any greater limitations than those included in the RFC finding must be affirmed.

## VI.     Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Karnok's applications for DIB and SSI is AFFIRMED.

**IT IS SO ORDERED.**

Dated: November 4, 2019

Thomas M. Parker
United States Magistrate Judge